UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CHRYSTAL SCISM, *individually and as administratrix of*
*the Estate of Joshua Scism,*

                                    Plaintiff,

                                                        1:18-CV-672
v.                                                      (TWD)

CITY OF SCHENECTADY, DETECTIVE BRETT
FERRIS, DETECTIVE RYAN KENT,

                                    Defendants.

_____

APPEARANCES:                              OF COUNSEL:

TREVOR W. HANNIGAN, PLLC.                  TREVOR W. HANNIGAN, ESQ.
Counsel for Plaintiff
90 State Street
Suite 1400
Albany, New York 12207

FINKELSTEIN & PARTNERS, LLP.               KENNETH B. FROMSON, ESQ
Counsel for Plaintiff                      RONALD ROSENKRANZ, ESQ
1279 Route 300
Newburgh, New York 12550

FINE, OLIN & ANDERMAN, LLP                 LAWRENCE D. LISSAUER, ESQ.
Counsel for Plaintiff                      MARSHALL P. RICHER, ESQ.
1279 Route 300
P.O. Box 1111
Newburgh, New York 12550

JOHNSON LAWS, LLC                          GREGG T. JOHNSON, ESQ.
Counsel for Defendants                     COREY A. RUGGIERO, ESQ.
646 Plank Road
Suite 205
Clifton Park, New York 12065

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## MEMORANDUM DECISION AND ORDER

On June 13, 2016, Joshua Scism ("Scism") was shot and killed during an interaction with Schenectady Police Department ("SPD") detectives Brett Ferris ("Ferris") and Ryan Kent ("Kent"). Scism's surviving spouse, Chrystal Scism ("Plaintiff"), brought this action against Ferris, Kent, and the City of Schenectady ("City") (collectively, "Defendants") alleging that each officer's conduct violated the United States Constitution.[1] Currently before the Court is Defendants' motion for summary judgment. (Dkt. No. 95.) As part of her response to Defendants' motion, Plaintiff moved to strike certain portions of Defendants' statement of material facts. (Dkt. No. 102.) Thereafter, Defendants moved to strike portions of Plaintiff's attorney affidavit and to preclude testimony from Plaintiff's proposed expert. (Dkt. No. 118.) Finally, the parties have moved for a Court order to seal certain documents. (Dkt. Nos. 91, 107.)

After carefully considering the record, the Court: (1) grants Defendants' motion for summary judgment (Dkt. No. 95) with respect to Plaintiff's claim against the City and against Kent on qualified immunity grounds and denies the motion (*id*.) with respect to Plaintiff's claim against Ferris; (2) denies Plaintiff's motion to strike (Dkt. No. 102) as moot; (3) denies Defendants' motion to strike (Dkt. No. 118) as moot; (4) denies Defendants' motion to seal (Dkt. No. 91) with respect to the audio/visual files but grants it with respect to personal information related to the confidential informant; and (5) denies Plaintiff's motion to seal (Dkt. No. 107) except as it relates to personal information of the police officers or the confidential informant.

---

[1] As Defendants point out, Plaintiff stipulated to the dismissal of all her pleaded state law claims—including her wrongful death claim. (Dkt. No. 19.) Therefore, the only remaining claims in this action are her 42 U.S.C. § 1983 claims against Kent, Ferris, and the City.

I.      **BACKGROUND**[2]

On June 13, 2016, at approximately 5:14 p.m., Scism approached a van parked in front of his residence.  (Dkt. No. 95-35 at ¶ 36.)  In that van, Ferris sat in the driver seat, Kent in the front passenger seat, Detective Pardi ("Pardi") sat in the middle seat, and a confidential informant ("CI") sat in the rear.  (Dkt. No. 95-27 at ¶ 15.)  The individuals in the van were parked in that location to prepare the CI for an undercover drug buy.  *Id*.  Scism approached the driver side window and said something to the effect that he did not want the occupants in the van to sell drugs on this street because there were kids around.  (Dkt. No. 102-23 at ¶ 37, (Plaintiff's response to Defendants' statement of material facts describing what the audio recorded).)  Ferris responded to Scism and said, "alright bro, alright."  *Id*. at ¶ 38.  After this interaction, Scism started to walk away from the van in the direction of the opposite side of the street.  (Dkt. No. 95-35 at ¶ 39.)

As he was walking away, Ferris noticed a handgun tucked in Scism's back waistband.  *Id*.  Ferris stated "He's got a heater," in reference to Scism's gun.  *Id*. at ¶ 41.  Ferris and Kent then exited the vehicle.  *Id*. at ¶ 42.  Kent testified that he pulled his badge from under his shirt, unholstered his gun, and started moving around the front of the van near the car in front.  (Dkt. No. 95-32 at ¶ 21.)  Ferris testified that he lifted up his shirt to expose his badge and remove his gun from its holster and as soon as he left the car he "drew [his] firearm" on Scism.  (Dkt. No. 95-27 at ¶ 23.)  In an audio/video recording of the incident, each officer individually yelled to Scism to "get on the [fucking] ground."  (Dkt. No. 95-2 (the audio/visual recording of the

---

[2]  The facts are drawn from Defendants' statement of material facts, (Dkt. No. 95-35), Plaintiff's responses thereto (Dkt. No. 102-23), and the attached affidavits, declarations, exhibits, and depositions.  The facts are taken in the light most favorable to Plaintiff.

interaction, currently filed under seal).)  Within seconds, the audio recorded the sound of Ferris

firing six shots at Scism, one of which hit him in the back of his head and caused his death. *Id*.

The above stated facts are undisputed with video/audio evidence or uncontradicted

deposition testimony.  However, there is contradictory evidence regarding Scism's final acts.  To

that end, Kent testified that he saw Scism start to make a move towards Ferris with his gun in his

hand.  (Dkt. No. 95-32 at ¶ 25.)  Ferris, likewise, testified that he saw Scism stop running, grab

his handgun with his right hand, pull it out of his waistband, and begin to turn towards him. (Dkt.

No. 95-27 at ¶ 27.)[3]  The CI, on the other hand, testified that he did not see Scism turn or make

any movement towards Ferris or Kent before he was shot.  (Dkt. No. 102-7 at 11-14, 47, (the CI

Deposition transcript, currently filed under seal).)  Furthermore, the medical evidence

demonstrates Scism was struck in the back of his head and the medical examiner testified that it

would be "extremely unlikely" that it would have hit the back of his head if he had been facing

Ferris shortly before he was shot.  (Dkt. No. 102-14 (deposition excerpt from Zhongxue Hua,

M.D., Ph.D.); Dkt. No. 95-13 (the autopsy report noting the entrance site is "along the right

posterior parietal scalp").)

## II.    DISCUSSION

### A.    Motions to Seal

Both parties have filed motions to seal certain exhibits attached to their respective filings.

(Dkt. Nos. 91, 107.)  To that end, Defendants seek to seal three audio/visual files (the "AV

files")[4] from June 13, 2016, that recorded the interaction between Kent, Ferris, Pardi, the CI, and

---

[3]  For his part, Pardi explained in a declaration that he was in the process of exiting the van when
the shooting took place and did not see Scism or Ferris the moments before the shooting.  (Dkt.
No. 95-31.)

[4]  The three files include a full-unedited copy of the audio/visual recording, an enhanced version,
and a copy with reduced speed.

Scism.  (Dkt. No. 91.)  Defendants also seek to seal an Affidavit from the CI and certain excerpts from the CI's deposition.  *Id*.  For her part, Plaintiff seeks to seal the entire deposition transcripts of the CI, Ferris, Kent, Pardi, Assistant Police Chief Seber, Sergeant Detective Savoia, and Lieutenant Sanders, along with Supporting Deposition Statements from Kent, Ferris, and Detective Savoia, each post-incident investigation statement from June 13, 2016, and SPD training records.  (Dkt. No. 107.)  For the reasons stated below, with some limited exceptions, both parties' motions are denied.

There is a general presumption in favor of public access to judicial documents.  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).  In *Lugosch*, the Second Circuit described a three-step inquiry to be used by district courts prior to permitting judicial documents to be withheld from public view.  The first step is to determine whether the document in question is, in fact, a judicial document.  *Id*.  "[T]he mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access. . . . In order to be designated a judicial document, the item filed must be relevant to the performance of the judicial function and useful in the judicial process."  *Id*. (citations and internal quotation marks omitted).  However, "documents submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents to which a strong presumption of access attaches."  *Id*. at 121.

After the Court has determined the document in question is a "judicial document," the second step involves considering "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance."

*Id*. at 119 (citations and internal quotation marks omitted).  Finally, the Court must "balance competing considerations," such as the impairment of law enforcement methods or information and the privacy interests of litigants.  *Id*. at 120.  The party seeking to file a document under seal bears the burden of demonstrating that sealing is warranted.  *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

As noted above, Plaintiff and Defendants seek a sealing order as to four main categories of documents: (1) deposition transcripts and statements of SPD police officers (Plaintiff's Exhibits 4-9, 11-14; Dkt. Nos. 102-8 through 102-13, 102-15 through 102-18); (2) the deposition transcript and statement from the CI (Defendants' Exhibit D; Dkt. No. 95-7; Plaintiff's Exhibit 3; Dkt. No. 102-7); (3) AV files related to the incident (Defendants' Exhibits A-1 through A-3; Dkt. Nos. 95-2 through 95-4); and (4) SPD training records (Plaintiff's Exhibit 16; Dkt. No. 102-20). The Court will consider each in turn.

With respect to the deposition transcripts and statements of SPD officers, Plaintiff argues the documents were produced pursuant to a Protective Order agreed to by the parties and should therefore remain confidential.  (Dkt. No. 107.)  However, "that a document was produced in discovery pursuant to a protective order has no bearing on the presumption of access that attaches when it becomes a judicial document."  *Collado v. City of New York*, 193 F. Supp. 3d 286, 289–90 (S.D.N.Y. 2016) (citing *Raffaele v. City of New York*, No. 13–CV–4607, 2014 WL 2573464, at *2 (E.D.N.Y. June 9, 2014)).  Plainly, under the standards set forth above, those documents are judicial documents subject to a strong presumption of public access.  The documents comprise a significant portion of the factual record before the Court and they pertain to matters that "directly affect" the Court's adjudication of Defendants' motion for summary judgment.  Indeed, it would be difficult for a member of the public to get a full picture of the

Court's reasoning without access to those documents.  Therefore, the Court denies Plaintiff's motion to seal to the extent that it seeks to file Plaintiff's Exhibits 4-9, 11-14; Dkt. Nos. 102-8 through 102-13, 102-15 through 102-18, under seal.  The Court will, however, permit Plaintiff to redact any irrelevant personal information from these exhibits such as dates of birth, addresses or related information.[5]

Similarly, Plaintiff and Defendants only suggest the CI's deposition transcript and his statement should be sealed pursuant to the protective order.  However, as noted above, the protective orders have no bearing on whether the Court should seal these documents when they become a part of the record at summary judgment.  Nevertheless, the Court is mindful of the safety interests regarding the identity of the CI and concludes that the parties may redact any of the CI's personal information in his affidavit and in his deposition transcript that could lead to his identification.

With respect to AV files, Defendants argue these documents are only "arguably" judicial and do not implicate the Court's exercise of its Article III judicial power.  (Defendants' October 27, 2020, Letter, not filed on CM/ECF).  The Court is befuddled by Defendants' position as the law in the Second Circuit is quite clear that "documents submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment." *Lugosch*, 435 F.3d at 121.  The Court recognizes the important safety considerations related to protecting the CI's personal information and, as stated above, will permit redactions to protect his identity.  However, there is no such concern with respect to the AV files because they do not

---

[5]  Plaintiff could largely avoid the need for redactions with respect to the deposition transcripts as she does not need to file the entire transcript with the Court but only the relevant excerpts that she uses to support her arguments.

identify the CI or show his face.  Accordingly, the Court finds the AV files cannot be filed under seal and denies Defendants' motion in this respect.

Finally, Plaintiff offers no justification to file the training records under seal beyond its putative confidentiality in the protective order.  However, as noted above, the existence of a protective order has no bearing on whether a Court may order a document sealed from public access under *Lugosch*.

In sum, the Court denies Plaintiff's and Defendants' motions to seal except as they relate to the name and personal information of the CI and to personal information related to each police officer.  The parties are directed to—within ten (10) days of this Order—file complete versions of the relevant documents on CM/ECF with redactions as provided above.

B.     **Motions to Strike**

At the time she filed her opposition to Defendants' motion for summary judgment, Plaintiff filed a motion to strike certain portions of Defendants' Statement of Material Facts. (Dkt. No. 102-2.)  To that end, Plaintiff asserts that many of the asserted facts in Defendants' Statement of Material facts are irrelevant to the motion for summary judgment and should be disregarded.  *Id*. at 2.  Specifically, Plaintiff asserts paragraphs 1-10, 12, 14-31, 33, 52, 57, 59, and 61-66 "pertain to information Defendants gathered after-the-fact of Defendant Ferris's use of deadly force on Mr. Scism."  *Id*. at 3.  Here, the Court generally agrees with Plaintiff that the cited facts alleged in Defendants' Statement of Material Facts are irrelevant to the pertinent issues to be considered on this motion, namely whether Defendants' use of force against Scism on June 13, 2016, was objectively reasonable.  Nonetheless, because the Court can rule on the motion without reference to these so-called "material" facts, it denies Plaintiff's motion as moot.

Defendants, for their part, seek to preclude Plaintiff's expert, Dr. Shane, from offering testimony in response to their motion for summary judgment.  (Dkt. No. 118.)  Defendants also seek to strike Plaintiff's attorney's affidavit filed with her opposition to Defendants' motion for summary judgment.  *Id.*

With respect to the attorney affidavit, Defendants argue it contains legal argument and, therefore, does not comply with Local Rule 7.1(b)(2).[6]  *Id.* at 30-32.  Here, the Court agrees that many of the statements within the affidavit include legal argument and are therefore inappropriately included in an attorney affidavit.  However, the Court declines to strike the attorney affidavit for the same reason it declines to strike portions of Defendants' statement of material facts.  Namely, the Court need not refer to, or consider, Plaintiff's attorney affidavit to consider the motion for summary judgment.

With respect to Dr. Shane's report, Defendants contend Plaintiff improperly uses Dr. Shane to present facts regarding the June 13, 2016, incident and opine about the ultimate issue of whether Defendants used excessive force.  (Dkt. No. 118-2 at 9-12.)  Defendants also assert Dr. Shane is not qualified to offer an opinion regarding the use of deadly force.  *Id.* at 13-15.  Furthermore, they argue his proffered testimony is unreliable and would not aid the trier of fact.  *Id.* at 15-25.  Additionally, they allege some of Dr. Shane's opinions must be stricken as he lacks personal knowledge.  *Id.* at 25-26.  Finally, Defendants contend Dr. Shane's opinions should be disregarded as the danger of unfair prejudice outweighs their probative value and they are irrelevant in any event.  *Id.* at 26-29.

---

[6]  That rule provides that, "[a]n affidavit must not contain legal arguments but must contain factual and procedural background that is relevant to the motion the affidavit supports."  L.R. 7.1(b)(2).

Here, after carefully considering Defendants' arguments, the Court finds no reason at this stage of the litigation to make a ruling on Dr. Shane's report or the use of his opinions as evidence at trial. As discussed in more detail below, the facts the Court finds that create a genuine dispute are supported by other admissible evidence. Therefore, Defendants' motion to strike Dr. Shane's report is denied as moot and with leave to renew before trial.

### C.    Motion for Summary Judgment

#### i.    The Pending Motions

Defendants move for summary judgment with respect to all of Plaintiff's claims. (Dkt. No. 95.) First, Defendants argue Kent did not violate Scism's constitutional rights because he indisputably did not fire his weapon. Defendants also contend the undisputed facts reveal Ferris's decision to fire his weapon at Scism was objectively reasonable. In any event, Defendants argue they are entitled to qualified immunity. Finally, Defendants contend Plaintiff has failed to adduce sufficient evidence to raise a question of fact regarding the City's putative liability.

#### ii.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see*

*also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

### iii.    Plaintiff's Fourth Amendment Claims[7]

The core issue is whether Ferris's and Kent's engagement with Scism was an unconstitutional exercise of force. As an initial matter, Defendants argue Plaintiff's "excessive force claim is premised upon the discrete act of firing upon [Scism] causing him to suffer a single fatal injury." (Dkt. No. 95-1 at 16.) In other words, Defendants contend the *only* relevant inquiry is whether Ferris's split-second decision to fire his weapon at Scism was justified and the Court ought to disregard the moments leading up to the shooting. In support of their position, Defendants cite to Plaintiff's amended complaint and suggest the only unconstitutional act alleged therein was the shots fired at Scism. *Id*. (citing Dkt. No. 6 at 12-13, 21, 23, 28, 33).

The record does not support Defendants' myopic reading of Plaintiff's amended complaint. Rather, the amended complaint describes Scism's interaction with Ferris and Kent

---

[7] The parties appear to assume that the Fourth Amendment—as opposed to the Fourteenth Amendment—applies in this case as they concede that Scism was seized as soon as two detectives exited their vehicle with guns drawn and yelled at him to get on the ground.

and discusses the lead-up to the eventual shooting.  Specifically, the amended complaint alleges Scism "was not a suspect in any crime, he had not engaged in criminal or suspicious activity, he was not under arrest, and he was not being detained."  (Dkt. No. 6 at ¶ 28.)  Undoubtedly, Ferris's split-second determination to fire upon Scism is one of the claims.  However, the Court construes Plaintiff's amended complaint as asserting a separate claim that Defendants' actions leading up to the shooting—including getting out of an unmarked van with guns trained on Scism and yelling at him to get on the ground—violated his constitutional rights.  *See Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994) ("[W]e carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage."), *cert. denied*, 513 U.S. 820 (1994).[8]

With this background understanding, the Court must consider whether the undisputed facts, taken in light most favorable to Plaintiff, could support a jury's verdict that Defendants violated Scism's constitutional rights when: (1) they exited the parked van with their weapons drawn and commanded Scism to get on the ground without verbally announcing that they were police; and/or (2) Ferris fired his weapon at Scism ultimately causing his death.[9]

---

[8]  Defendants' misunderstanding of the claims in front of the Court animates one of their arguments for summary judgment.  Specifically, Defendants assert the undisputed facts demonstrate Kent never fired his weapon, so he was not involved in the use of excessive force.  However, the Court construes the amended complaint as asserting Kent's decision to draw his gun upon Scism and yell at him to get on the ground violated his constitutional rights.

[9]  The Court finds, contrary to Defendants' position, that Plaintiff does not invoke the so-called "provocation rule."  Under that rule, "an officer's otherwise reasonable (and lawful) defensive use of force is unreasonable as a matter of law, if (1) the officer intentionally or recklessly provoked a violent response, and (2) that provocation is an independent constitutional violation."  *Cnty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1545 (2017).  In *Mendez*, two police officers entered a shack in the rear of a residence without a search warrant and without knocking or announcing their presence.  *Id*. at 1544–45.  One of the plaintiffs, who mistakenly believed the noise was made by a fellow resident, reached for a BB gun to help lift himself out of bed.  The officers, seeing the BB gun, mistook it for a rifle, and fired several rounds, injuring the plaintiffs.

### 1.    Controlling Law

"The Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive is to be analyzed under that Amendment's 'reasonableness' standard." *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  A police officer's use of force is "excessive" in violation of the Fourth Amendment if it is objectively unreasonable in light of the facts and circumstances known to the officer.  *Lennon v. Miller*, 66 F.3d 416, 425–26 (2d Cir. 1995).  To determine whether the amount of force applied to a plaintiff was unreasonable, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

"[E]ven if defendants' actions were unreasonable under current law, qualified immunity protects officers from the sometimes-hazy border between excessive and acceptable force." *Kerman v. City of New York*, 261 F.3d 229, 239 (2d Cir. 2001) (internal quotation marks, ellipsis, and citation omitted).  "If the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." *Id*. (citation omitted).  However, "[g]iven the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113,

The district court concluded, and the Ninth Circuit affirmed, that, although the officers' shooting was otherwise reasonable under the applicable standard for excessive force, the officers had engaged in excessive force under the provocation rule due to the prior warrantless entry.  The Supreme Court reversed rejecting the provocation rule.  Specifically, the Court reasoned that the provocation rule "mistakenly conflates distinct Fourth Amendment claims." *Id*. at 1547.  Here, therefore, rather than conflating two distinct Fourth Amendment claims, the Court will treat them separately in evaluating whether summary judgment is appropriate.

123 (2d Cir. 2004); *see also Kayo v. Mertz*, No. 19-Civ., 2021 WL 1226869, at *14-15 (S.D.N.Y.

Mar. 31, 2021).  Indeed, the Second Circuit has consistently held that summary judgment is

inappropriate if "determination of [a constitutional violation] 'turns on which of two conflicting

stories best captures what happened on the street.'" *Cowan ex rel. Estate of Cooper v. Breen*,

352 F.3d 756, 763 (2d Cir. 2003) (quoting *Saucier v. Katz*, 533 U.S. 194, 216 (2001)); *see also*

*Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999) ("Because the district court could not

determine whether the officers reasonably believed that their force was not excessive when

several material facts were still in dispute, summary judgment on the basis of qualified immunity

was precluded."); *Hemphill v. Schott*, 141 F.3d 412, 416–18 (2d Cir. 1998) (holding that the

district court erred by entering summary judgment on qualified immunity when there were

disputes remaining about "material factual issues").

## 2.    Defendants' initial interaction with Plaintiff

Here, the facts establish Kent and Ferris exited an unmarked vehicle with their guns

drawn and yelled at Scism to get on the ground.  Undoubtedly, *Garner* establishes that

"apprehension by the use of deadly force is a seizure subject to the reasonableness requirement

of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  Here, when considering

the *Graham* factors, the Court finds—viewing the evidence in light most favorable to Plaintiff—

it weighs in favor of finding that their conduct could have been unreasonable.  To that end,

Scism was not a suspect of any crime when Kent and Ferris engaged him with their guns drawn.

Indeed, by his own account, Ferris did not believe Scism was involved in illegal activity when he

exited the car.  (Dkt. No. 95-27 at ¶ 24 (Ferris stating he "did not have time to analyze which

crimes [Scism] had engaged in"); Ferris Deposition at 77-79 (stating he "menaced everybody in

the vehicle" and maybe committed an "attempted assault.").)  Indisputably, it is not *per se* illegal

in New York to carry a concealed firearm. Defendants do not claim they knew Scism's firearm was unlicensed or that he was a felon and prohibited from carrying a gun. Thus, at the moment they saw the gun, there were no facts tending to show that Scism had committed any crime, let alone a serious one.

Furthermore, there is at best contradictory evidence that Scism was a threat at the time they first engaged him. To wit, the CI testified that Scism merely told Ferris that they should not be selling drugs in this area. (Dkt. No. 102-7, CI Deposition at 25.) Furthermore, the AV recording leaves room for a juror to interpret the interaction. Specifically, it is at least arguable, as Plaintiff notes, that Scism said "If you're meeting somebody don't be selling no drugs on my block, I've got kids." (Dkt. No. 102-23 at ¶ 37.) Indeed, Kent and Ferris each testified that it was their opinions that Scism thought they were dealing drugs. (Dkt. No. 102-9, Kent Deposition at 46; Dkt. No. 102-8, Ferris Deposition at 28.) The parties offer starkly different interpretations of how to consider this interaction,[10] but the Court finds it is the jury's role to review the evidence and determine whether Scism approached the vehicle in a threatening manner or whether he approached the vehicle as a concerned citizen.

The last factor, whether Scism was actively resisting arrest or fleeing arrest, weighs in Scism's favor. It is not seriously contested that Scism did not know Ferris and Kent were police officers when he spoke with them at the car. As stated above, Ferris testified he thought Scism believed he was there to sell drugs. (Dkt. No. 102-8, Ferris Deposition at 28.) Ferris and Kent each testified that their badges were covered until they exited the vehicle, and the AV recording demonstrates they did not announce that they were police when they yelled at Scism to get on the

---

[10] Specifically, Ferris testified that Scism was "angry," "tense," and "agitated" when he approached the car. (Dkt. No. 102-8, Ferris Deposition at 29.)

ground.  (Dkt. No. 95-2.)  Therefore, a jury could easily conclude that Scism's retreat from the

car was not an attempt to flee an arrest but was rather him simply walking away.

In sum, the Court finds a reasonable juror could find Kent's and Ferris's decision to leave

the van and engage Scism with their guns drawn was an unreasonable use of force.

However, that is not the end of the inquiry as the Court finds Kent and Ferris are entitled

to qualified immunity for their actions leading up to the shooting as most cases within the

Second Circuit hold that merely drawing weapons when effectuating an arrest does not constitute

excessive force as a matter of law.  *See Cabral v. City of New York*, No. 12–CV–4659, 2014 WL

4636433, at *11 (S.D.N.Y. Sept. 17, 2014) ("[The defendant's] approach with his gun drawn

does not constitute excessive force as a matter of law."); *Mittelman v. Cnty. of Rockland*, No. 07-

CV-6382, 2013 WL 1248623, at *13 (S.D.N.Y. Mar. 26, 2013) ("Likewise insufficient is

[the][p]laintiff's assertion that the officers pointed guns at him.  A threat of force does not

constitute excessive force."); *Askins v. City of New York*, No. 09–CV–10315, 2011 WL 1334838,

at *3 (S.D.N.Y. Mar. 25, 2011) ("While the Second Circuit has noted that circuit law could very

well support a claim that a gunpoint death threat issued to a restrained and unresisting arrestee

represents excessive force, [the] plaintiff's assertion that a gun was pointed at his head cannot be

the basis of a claim for excessive force." (alterations and internal quotation marks omitted));

*Aderonmu v. Heavey*, No. 00–CV–9232, 2001 WL 77099, at *3 (S.D.N.Y. Jan. 26, 2001)

(dismissing excessive force claim based on an interrogation at gunpoint because the plaintiff

"fail[ed] to allege that any physical force was used against him during his interrogation, or that

any injuries resulted from [the] defendants' allegedly unconstitutional conduct"); *Shaheed v. City

of New York*, 287 F. Supp. 3d 438, 454 (S.D.N.Y. 2018), *aff'd sub nom. Shaheed v. Kroski*, 833

F. App'x 868 (2d Cir. 2020) (holding that the allegation that the officers pointed their rifles at the

plaintiffs did not constitute excessive force); *but see DiSorbo v. Hoy*, 343 F.3d 172, 184 (2d Cir. 2003) (stating that a jury could reasonably find and award damages for psychological injuries in an excessive force case, though finding the award excessive in that case); *Kerman*, 261 F.3d at 232, 239–40 (finding that officers' name-calling and threat to "blow [arrestee's] brains out" amounted to "verbal abuse [and] humiliation" which "might well be objectively unreasonable and therefore excessive").

Therefore, the Court cannot say as a matter of law that that Kent and Ferris's actions—even viewed in light most favorable to Plaintiff—violated clearly established law before Ferris fired his weapon.  Accordingly, Plaintiff's excessive force claim based on Ferris and Kent drawing their guns at Scism is dismissed.

### 3.        When Ferris Fired his Weapon at Scism[11]

On the initial inquiry of whether a constitutional violation occurred, an officer's decision to use deadly force is objectively reasonable only if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or

---

[11]  Though the Court finds Plaintiff did not plead a failure to intervene claim in her amended complaint, even if she had, it would be dismissed against Kent.  "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *see also Snead v. City of New York*, 463 F. Supp. 3d 386, 400 (S.D.N.Y. 2020) ("Law enforcement officers have an affirmative duty to intervene to prevent fellow officers from infringing on citizens' constitutional rights." (citation omitted)).  "Liability may attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988)), *aff'd sub nom. Jean-Laurent v. Wilkerson*, 461 F. App'x 18 (2d Cir. 2012).  Here, no reasonable juror could conclude Kent had a "realistic opportunity" to intervene before Ferris shot at Scism because there simply was not enough time between when they exited the vehicle and Ferris shot at Scism.  (Dkt. No. 95-2.) Therefore, even if a failure to intervene claim had been pled, it would be dismissed.

others." *O'Bert ex rel Estate of O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003); *see Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). The reasonableness of the officer's decision "depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996). In this case, resolution of whether a constitutional violation occurred centers on whether at the moment Ferris decided to fire at Scism, he reasonably believed that Scism put his life or others in danger. Ferris argues the undisputed facts demonstrate he reasonably believed that his life was in danger; therefore, as a matter of law, no constitutional violation occurred. (Dkt. No. 95-1 at 20-25.) However, to accept Ferris's argument that, as a matter of law, his actions were objectively reasonable, one would have to accept, as a matter of fact, that Scism posed an immediate threat and was turning towards him with his gun in his hand about to fire at Ferris. Such facts are in dispute.

Specifically, though Ferris and Kent both testified they saw Scism grab his gun and turn towards Ferris before Ferris shot at him, there is evidence that Scism was still retreating at the time he was shot. Specifically, Scism was indisputably shot in the back of his head—demonstrating that he was faced away from Ferris when he was struck in the back of his head. (Dkt. No 95-13.) Importantly, Plaintiff's medical expert testified that it would be "extremely unlikely" that Scism could have been facing Ferris with his gun drawn at one instance and then had time to completely turn and be struck in the back of the head. (Dkt. No. 102-14 at 5.)[12]

---

[12] Defendants argue Scism must have turned away from the gun shots and that is the reason he was not facing Ferris when he was shot. (Dkt. No. 95-1 at 24.) Though that is one permissible inference to be drawn from the location of the entry wound, the Court is required—at this

Furthermore, the CI testified that he never saw Scism stop or turn towards Ferris before he was shot.  (CI Deposition at 11-14; 57.)  Moreover, as discussed above, there is contradictory evidence in the record regarding the initial interaction with Scism and whether he was acting in a threatening manner or if he was simply concerned that Ferris and Kent were dealing drugs on his street.  In sum, though the jury may ultimately credit Ferris's and Kent's testimony and find that shooting Scism was objectively reasonable, it is at least possible, given the other record evidence, that a jury could find Ferris shot Scism as he was retreating and that Scism was not posing an immediate threat.  Therefore, the Court finds summary judgment is not appropriate with respect to Plaintiff's excessive force claim against Ferris.

Relatedly, because there are genuine issues of material fact regarding the reasonableness of Ferris's use of force, summary judgment must also be denied on qualified immunity grounds. *See Cowan*, 352 F.3d at 764-65 (denying summary judgment on a qualified immunity claim after determining in the excessive force analysis that there were genuine issues of material fact regarding the reasonableness of the officers' conduct); *see also Gjenashaj v. City of New York*, No. 19 Civ. 4142, 2020 WL 7342723, at *4 (S.D.N.Y. Dec. 14, 2020) (denying summary judgment on defendants' qualified immunity claim because material facts remain in dispute as to plaintiff's excessive force claim); *Bennett v. Falcone*, No. 05 Civ. 1358, 2009 WL 816830, at *6 (S.D.N.Y. Mar. 25, 2009) ("For the same reasons Plaintiff's excessive force claim survives summary judgment, the Court holds Defendants' qualified immunity claim insufficient.").

---

stage—to view the facts in a light most favorable to Plaintiff and it is arguable that an entry wound on the rear of Scism's head indicates he was retreating as Ferris fired at him.

iv.      *Municipal Liability*

"For the purpose of Section 1983, a municipality is not vicariously liable for the acts of its employees," *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)), but a municipality is liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694.  "To hold a municipality liable in such an action, 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'"  *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

A municipal policy or custom may be established where the facts show: (1) a formal policy, officially promulgated by the municipality, *Monell*, 436 U.S. at 690; (2) action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986); (3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30 (1985); or (4) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact, *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  "[A] municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials."  *Zahra*, 48 F.3d at 685.

In this case, in response to Defendants' motion for summary judgment, Plaintiff asserts that sufficient evidence suggests the City failed to train its employees to address how to properly use deadly force.  (Dkt. No. 102-24 at 11-17.)  However, as Defendant correctly points out, Plaintiff failed to allege this theory of liability in her amended complaint.  Indeed, the amended

complaint is completely devoid of any allegations related to the City's training procedure and how any deficiency therein caused the shooting at issue here.  Rather, Plaintiff generally argued that the City failed to adequately address or punish misconduct and has therefore "acquiesced to" misconduct.  (Dkt. No. 6 at ¶ 39.)  "Generally, courts will not consider, on a motion for summary judgment, allegations that were not pled in the complaint and raised for the first time in opposition to a motion for summary judgment."  *Mahmud v. Kaufmann*, 607 F. Supp. 2d 541, 555 (S.D.N.Y.), *aff'd*, 358 F. App'x 229 (2d Cir. 2009) (citing *Alali v. DeBara*, 2008 WL 4700431, *3 n. 6 (S.D.N.Y. Oct. 24, 2008)); *Southwick Clothing LLC v. GFT (USA) Corp.*, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion.").  Thus, because Plaintiff has seemingly abandoned the pleaded theory of *Monell* liability she put forward in her amended complaint in favor of a failure to train theory she never pled, the Court grants Defendants' motion for summary judgment against the City.

In any event, even were the Court to look past Plaintiff's failure to properly draft or amend her complaint, it would still find that she failed to present evidence showing the City is liable.  To that end, Plaintiff's theory of municipal liability in her opposition papers is that the City's failure to adequately train their officers regarding the use of deadly force amounted to deliberate indifference to the rights of those with whom those officers would interact.  (Dkt. No. 102-24 at 11-12.)  To demonstrate that a failure to train constitutes "deliberate indifference," a plaintiff must satisfy three elements: (1) that a policymaker knows to a "moral certainty" that employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a

history of employees mishandling the situation; and (3) that the wrong choice by the employee

will frequently cause the deprivation of a citizen's constitutional rights. *Jenkins v. City of New

York*, 478 F.3d 76, 94 (2d. Cir. 2007) (internal quotation marks and citation omitted). "In

addition, at the summary judgment stage, plaintiffs must identify a specific deficiency in the

city's training program and establish that that deficiency is closely related to the ultimate injury,

such that it actually caused the constitutional deprivation." *Green*, 465 F.3d at 81 (internal

quotation marks and citation omitted).

Here, Plaintiff failed to identify any evidence demonstrating "a specific deficiency in the

city's training program," much less explain how that alleged deficiency "is 'closely related to the

ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Amnesty Am.*, 361

F.3d at 129 (quoting *City of Canton*, 489 U.S. at 391).  Rather, Plaintiff's arguments amount to

general and conclusory claims that the City's training was insufficient.  (*See e.g.*, Dkt. No. 102-

24 at 14 (alleging Defendants participated in training "in which 'review and understand use of

deadly force policy' was one of eleven topics to be discussed"); *id*. at 15 (claiming "[t]he

respective deposition testimonies of the SPD witnesses demonstrate that any instruction or

training provided on the use of deadly force policy did not make learning the use of deadly force

policy a priority, much less a requirement").)  In sum, Plaintiff has failed to proffer evidence that

would allow a reasonable juror to conclude the City was deliberately indifferent to Scism's

constitutional rights based on its training program related to the use of deadly force.

Accordingly, the Court grants Defendants' motion for summary judgment regarding any claims

against the City.

### III.     CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion for summary judgment except as it relates to Plaintiff's claim against Ferris for excessive force.  The remaining claim against Ferris will be scheduled for trial where the jury will consider whether his conduct was objectively reasonable.  The Court further denies Plaintiff's and Defendants' motions to strike certain parts of the record as moot.  Finally, the Court denies Plaintiff's and Defendants' motions to seal except as noted herein and orders the parties to file these documents on the Court's CM/ECF system (with redactions, where necessary) within ten (10) days from this Order.  The Court will set a trial date in a separate Order.

**ACCORDINGLY**, it is hereby

**ORDERED** that Defendants' motion to seal (Dkt. No. 91) is **DENIED** in part and **GRANTED** in part as discussed herein and Defendants will have ten (10) days from the date of this Decision and Order to file complete versions of the relevant documents (with redactions as necessary) with the Court; and it is further

**ORDERED** that Plaintiff's motion to seal (Dkt. No. 107) is **DENIED** in part and **GRANTED** in part as discussed herein and Plaintiff will have ten (10) days from the date of this Decision and Order to file complete versions of the relevant documents (with redactions as necessary) with the Court; and it is further

**ORDERED** that Plaintiff's motion to strike (Dkt. No. 102) is **DENIED** as moot; and it is further

**ORDERED** that Defendants' motion to strike (Dkt. No. 118) is **DENIED** as moot; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 95) is **DENIED** in part and **GRANTED** in part as discussed herein.

**IT IS SO ORDERED.**

Dated: September 29, 2021
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge